JOHN B. REBOUL AND ANOTHER *vs.* JAMES E. CHALKER AND ANOTHER.

A. and B. executed a contract on the 17th day of April, 1855, which they entitled "articles of copartnership," by which they declared their intention to form a copartnership for the purpose of trade, which should continue for three years from the first day of May, 1855. The contract declared the parties to be equal owners of a certain stock of goods, of which a schedule was annexed, and that they were to continue to be owners of the same in the same proportions, and contained various provisions with regard to the mode of conducting the partnership business. Held, that the term of the copartnership was not to commence until the 1st day of May, 1855, and that until then the contract was merely an executory one, which either party had the power to refuse to perform, such refusal constituting only an ordinary breach of contract, for which the party was liable in damages, and not a dissolution of an existing copartnership.

Whether one partner has power, by his own act, to dissolve a copartnership for a cause not provided for by the partnership contract: *quere.*

On a motion for a new trial for a verdict against evidence, the opinion of the jury as to the degree of credit to be given to a witness can not be reviewed.

But where a party testified that he was not a partner with another at a certain time, but stated facts from which, in connection with the other evidence in the case, the jury ought to have inferred that he was a partner, it was held that the opinion of the jury, in finding that he was not a partner, could be reviewed.

The superior court under the statute (Rev. Stat., Tit. 1, §.155,) can allow a motion for a new trial for a verdict against evidence, only where it is of opinion that the verdict is of that character; but it is not necessary that this opinion should be certified by the court in allowing the motion.

ASSUMPSIT for goods sold, brought against James E. Chalker and N. A. Cowdrey, as partners under the name of "J. E. Chalker." The goods were sold on the 29th of August and 2d of October, 1856. The defence was wholly made by Cowdrey, who denied the existence of the copartnership.

On the trial to the jury, the following contract between the defendants was read in evidence:

"Articles of copartnership made and concluded this 17th day of April, 1855, between J. E. Chalker and N. A. Cowdrey, both of the city of New Haven. Whereas it is the intention of the parties to form a copartnership for the purpose of carrying on the retail hat, cap and fur business, for which purpose they have agreed upon the following terms,

to the faithful performance of which they mutually bind themselves, each to the other, his executors and administrators: 1st. The name of the copartnership shall be "J. E. Chalker," and it shall continue for the term of three years from the 1st day of May, 1855, except in case of the death of either of the parties within said term. 2d. The said Chalker and the said Cowdrey are the proprietors of the stock, a schedule of which is contained in the stock book, in equal proportions, and shall continue to be owners of the same in the same proportions. 3d. All profits which may accrue to the partnership shall be divided equally, and all losses happening to the firm in any manner, and all expenses of the business, shall be borne equally. 4th. The said Chalker shall devote all his time and attention to the business of the firm. 5th. All the purchases, sales, transactions and accounts of the firm shall be kept in regular books, which shall always be open to the inspection of both parties and their legal representatives. An account of stock shall be taken, and an account between the parties shall be settled, as often as once in each year, and as much oftener as either partner may desire and in writing request. 6th. Neither of the parties shall subscribe any bond, sign or endorse any note of hand, accept, sign or endorse any draft, or assume any other liability in the name of the firm, for the accommodation of any other person, without the consent in writing of the other party ; nor shall either party lend any of the funds of the copartnership without such consent. 7th. Neither party shall withdraw from the joint stock at any time more than at the rate of $500 per annum, and in that proportion for a longer or a shorter time; and each partner may withdraw that sum per annum if there is a sufficient balance of profits to warrant it. 8th. At the expiration of the term, or earlier dissolution of this copartnership, the said Cowdrey shall be entitled to withdraw or take from the joint stock the sum of $4,000 if he shall have paid in that much, and the balance then remaining shall be equally divided between said Chalker and said Cowdrey; and if the parties or their representatives can not agree in the division of the stock and assets of the firm then

on hand, the whole effects of the firm shall be sold at public auction, at which both parties shall be at liberty to bid and purchase like other individuals, and the proceeds shall be divided as above. 9th. For the purpose of securing the performance of the foregoing agreement, it is agreed that either party, in case of any *violation* thereof by the other, shall have the right to dissolve this copartnership forthwith, on his becoming informed of such violation. In witness whereof we have hereunto set our hands the day and year above named. J. E. Chalker, N. A. Cowdrey."

The plaintiffs claimed to have proved by the testimony of Chalker and others, that, at the time of the execution of the articles of partnership, Chalker and Cowdrey purchased a stock of goods for the partnership business of one Mansfield, for which Cowdrey advanced $4,000, which purchase was made in the name of "J. E. Chalker;"—that on the 18th day of April a store in the city of New Haven, for the purposes of the business, was taken by Chalker for the term of three years from the 1st of May, 1855;—that on the same day a set of account books was purchased for the business;—that Chalker immediately commenced the sale of goods in the store thus leased, in accordance with the partnership arrangement;—that on the 11th day of May, Cowdrey gave to Chalker a letter of credit to a firm in the city of New York, of the following tenor: "Please let J. E. Chalker of New Haven have such goods as he desires for his store in that place to an amount not exceeding $1,000 at any one time, and I will be responsible for the payment of the same until further notice;"—that from the commencement of the business until after the purchase of the goods in question by Chalker from the plaintiffs, Cowdrey was frequently in the store, making entries in the account books, advising as to the business, and taking goods for his own use at cost price, and that he had in some instances been introduced to strangers by Chalker as his partner. The plaintiffs also introduced evidence of many other acts on the part of Cowdrey indicating that he was interested in the business of the store, but it is not necessary to state them more fully.

Reboul *v.* Chalker.

The principal evidence on the part of the defendant was that of Cowdrey himself, which was substantially as follows: " I became acquainted with Chalker in the winter, previous to the spring of 1855. About the 1st of April he was out of business. I had confidence in him. He excited my sympathy. At first he wanted me to endorse for him. I preferred to assume a liability at once. After a talk it resulted in his buying the store of Mansfield for $4,000. I paid the $4,000 and took his note for the amount. Within two or three days after we entered into the agreement, I heard that he owed Moser of New York about $500. 1 had known of his being in business in Springfield, Mass., and of his failing there, and that previous to this there were old debts, contracted while in business there, hanging over him. He had assured me, before my entering into the arrangement with him, that these debts were all settled, and that he was then out of debt. I went immediately over to the store, somewhat excited, and said, " How is this? You have deceived me,—you told me wrong,—you are owing debts in New York." He equivocated a good deal, but finally admitted that he owed Moser and a few others, but said he could buy the debts very cheap. He thought it was no business of mine. He said that by the aid of his friends he could satisfy these debts. I told him if he had friends to bring them forward. He said he could settle those claims at any time, and would shortly. I said I would shut up the store immediately with an officer if those debts were not paid. He asked what it was to me if he did owe in New York. I told him at that time that the writing between us would not be carried out and was of no effect. This was before the first of May, 1855. It resulted in his going to Hartford and coming back again and telling me that he had arranged to pay the debts. Soon I heard that he had not settled them all, and spoke to him again about it. He thought I was unreasonable, and showed me a discharge from one of the parties in New York, and said he had arranged to settle them all. I never authorized him after that conversation to go on under the agreement. My constant endeavor from that time was to get out and get my

money back. He told me in that conversation that he owed Williams & Cunningham. One inducement used by him to get me to go into the business was, that the store was directly opposite to my office and that I could see what was going on and be in there when I wished, and that I could have free access to his books and look them over at all times, and he wished me to do so. I never had any right or title to the store of goods. Both of us immediately commenced making efforts to sell. I had his full authority to sell. Not long before this I had sold some real estate and taken mortgages back,— one for $1,500, to be paid in annual installments of $300 each, and one for $2,300 payable on demand, but with the understanding that it should run a year. I was desirous to turn them into money. The inducement which led me to go into the business was that he would get somebody to buy me out, and so I would realize the money on the mortgages. He was to get some one to advance $2,000, and his brother was to let him have $2,000. In pursuance of this agreement he tried to find a party who would come in with him on these or similar terms. He was to get somebody to go in with him and pay me $2,000, and the balance I was to wait for a reasonable time. I had no communication with Mansfield till he came to my office for his pay. He sold to Chalker and gave him a bill of sale. Chalker paid him for the goods. The deeds to Mansfield were direct from me to him. Chalker gave me his note for $4,000, dated April 17th, 1855, and assigned to me the policy of insurance. I have credited him on my books with $3,574.76 on the note, leaving due, Feb. 12th, 1857, $826.42. I knew the hat business to be very profitable if well managed, and did not know but I might be willing to go into the business with him in case he should not make a satisfactory sale. His books show that he made money in the store, that there were assets enough to pay all the debts if he would apply them for that purpose. He claimed the lease of the store to be his private property and that I had no interest in it, and that prevented my selling without his consent. The lease was for three years from 1st of May, 1855, and dated April 18th, 1855. Chalker was to

Reboul *v.* Chalker.

sell the whole stock before the first of May, if he could, to my satisfaction. As to the terms of payment, he was to consult me and have the payment satisfactory to me. He could have sold the whole stock, including the lease, for a handsome premium on cost, at least $1,000. My leading idea was to get $2,000 cash. My intercourse with Chalker after I told him the agreement was revoked was that of a creditor. I aimed solely after that to get my pay out of the concern. I was in the store frequently for some time. Soon after he commenced I went west, and was gone most of the summer, until September. I tried to keep watch of his books and see what he was doing, to judge whether to put the note in suit. I thought I could get my pay better by letting him go on. The books showed a fair profit. I occasionally after that examined the books, at first, by request, afterwards, because I wanted to. I had a note to pay, June 23d, 1856, and asked Chalker to make me a payment on his note. He said he would. He asked for a receipt. I said the book is open and I will charge it in my handwriting which is equivalent to a receipt. I then took a note against Mallory as cash, and the balance of the amount was cash. I then entered on the books a debit to myself of $175. I once corrected a charge against myself on the books. Chalker was not present when I did it, and nothing was said about it. He had charged me $1,800 for the goods he let Wallace have for real estate. I was to have the goods at cost, in part payment of the note, and so altered the charge to $1,669. He subsequently altered it back. In opening his books and keeping some accounts I showed him how, as he was not familiar with bookkeeping. On the 15th of December, 1856, I learned facts that induced me to tell Chalker that he must pay the note immediately. He told me that I might sell the goods and do what I pleased, and that he would do all for me that he could. My conversation was that of a creditor. I then went to the store and began to take an inventory. My purpose was to see where the property was. He said he meant to sell off and pay me if he could. He aided in taking the inventory, expressed gratitude to me for what I had done for him, and said that if

I would take the goods he would give me his time gratuit-
ously in selling them.   The inventory showed an overplus of
$1,300, but the clerk made a mistake of $1,000, the overplus
was $300 only.   He continued there till Feb. 12th, 1857.   I
felt comparatively easy after the inventory.

   " About the first of January, 1857, Chalker brought a Mr.
Wallace into my office, to see me about the goods and a
trade of a part of them for real estate.   I looked at the land
in Wallingford and concluded I was willing to take it at a
price not exceeding $1,800.   The deed was made to me by
Wallace.   From that time both Chalker and myself were
looking for a purchaser of the balance of the goods.   I found
Mr. Sanford, and agreed with him that he should have the
goods at an appraisal.   Chalker said, when I told him that
I agreed to have the difference charged to me, that he must
have cost for them.   I got the appraisers, and he assisted in
making the appraisal.   The appraisal and sale to Sanford
was for the purpose of making a payment on my note.
Sanford did not take the fixtures.   Chalker sold them to
Collins for $750, and paid the money to Williams & Cun-
ningham.

   " I never acknowledged to any person that I was a partner
of Chalker.   Chalker did not introduce me to Martin as his
partner.   I remember their coming into my office that eve-
ning.   I went with Chalker to Williams & Cunningham on
the 11th of May, 1855. . They were not in when we first got
there.   Some friend of Chalker's, I believe one of the clerks,
invited me to go through the building, which I did.   We
came down and saw Mr. Cunningham.   Had a transaction
with him.   Chalker introduced me to him as his friend from
New Haven who was going to furnish funds to aid him.   I
was not spoken of nor did anything as the partner of Chalker.
I gave Cunningham an order to let Chalker have goods to an
amount not exceeding $1,000 at any one time.   Cunningham
wanted a reference, and I referred him to C. Durand & Co.,
or any body else from New Haven.   I did not see him again
till January, 1857.   I had a conversation with Stone at his

Reboul *v*. Chalker.

shop, but did not tell him I was a partner of Chalker. Had no occasion to do so.

"I took the key of the safe over to my office one night. There was nothing in the store. I took it as a matter of friendship. There was property enough to pay all his creditors, if he would apply it. I was anxious all should get their pay. The only men that I recollect of particularly advising him to pay were Williams & Cunningham. I knew of their debt in December, 1856. It was then about $600. I refused to give Chalker a copy of the articles, and told his brother that the agreement was of no effect. Sylvester Chalker agreed at that interview to buy me out and pay the note. I was to give him $500 to do so. This was be-between 14th January and 12th February, 1857. I had frequently offered to give Chalker $100 to pay the note. I gave no directions as to the purchase of goods. I knew there were debts in New York, but I never saw the men who claim to be my creditors until I saw them since this trial commenced, and never heard from them until I was sued. I tried to get him to place the accounts due him in the hands of some attorney to collect for the benefit of his creditors."

*Cross-examined.*—"I made the alteration on the ledger about the time the business stopped. Janes, the clerk, might have seen me do it. I did not tell him what I was doing. I altered it because I supposed whoever had made the charge had made a mistake as to the amount. The difference as altered was $131. I don't think I ever had $80 worth of goods out of the store. Had fifty caps, which I sent to the Orphan Asylum. I was to have all I took at cost. I don't know what was charged to me. I was not so particular about it because he owed me so much, I had out of store $513, charged on his books. My object in buying was to sell as soon as possible. I did not tell Cunningham in New York that I was responsible for all debts contracted for goods, nor that I had set Chalker up. Did not assume any responsibility except by the guarantee. Chalker's tools I sold to the Hope boy, with Chalker's consent. Went to see him two or three times before he gave his consent. I might have given

Chalker $1,500 railroad bonds to show Mansfield before I offered the real estate; that was all I had. I guaranteed the lease of the store to Hotchkiss, on the 18th of April, 1855. I have been at the safe in the store occasionally, and taken out the books and looked at them. Although I looked at the books I could not tell how the store stood. He did not enter his bills on the book. I have reason to think that Moser is not paid; also that some of the New York debts were paid out of the store. I looked into the books and made up my own bill and copied it into my book last winter. I think Chalker was by when I took the copy. Chalker left the lease with me to return to Hotchkiss, and that is the way I came to have possession of it now. After my interview with Chalker, December 15th, 1856, I went to the store and commenced taking the inventory, and assisted till it was done. I don't know of any balance sheet. I have no doubt I looked over the books to see what Chalker was drawing out of the concern, and saw that he was not drawing very fast as appeared by the books. Sylvester Chalker wanted to know what kind of writings there were between us. I said nothing to him about releasing his brother or myself. I told them if they would pay my note I would quit-claim and relinquish everything. I may have cautioned Chalker about drawing too fast. I never drew a cent out. There was a book of liabilities which I advised him to keep. I opened it Dec. 15, 1856."

In the argument of the case to the jury the counsel for Cowdrey claimed that the articles of co-partnership were never acted upon or carried into execution; that prior to the 1st of May, 1855, Cowdrey, by the notice which he gave to Chalker, under the circumstances and in the manner stated in his testimony, had terminated the contract, and that the relation of partners never actually existed between them; and claimed, as matter of law, that Cowdrey could, by his own act, terminate the contract, whether such termination was assented to by Chalker or not; and so requested the court to charge the jury. The plaintiffs' counsel claimed, as matter of law, that the contract could not be annulled by the

act of Cowdrey alone, and that his notice of the termination of the contract was of no legal validity as against the plaintiffs or against Chalker, unless assented to by Chalker; and so requested the court to charge the jury. They also claimed as matter of fact to the jury, that the contract was not abandoned, but was acted upon by both parties until long after the plaintiffs' account accrued.

The court charged the jury as follows: " It is conceded that the goods charged in the plaintiffs account were furnished to the defendant Chalker. He has suffered judgment by default, and the only question before you relates to the liability of the defendant Cowdrey. The plaintiffs claim that at the time the goods were furnished he was a partner with Chalker in the business for which they were purchased and in which they were used, or was entitled by a subsisting agreement to share the profits of the business carried on by Chalker. The questions in the case are substantially questions of fact for the jury, and if the facts claimed by the plaintiffs are proved they are entitled to recover.

" The production of the articles, executed in the ordinary way and remaining uncanceled, connected with the testimony of Chalker that the business was carried on in pursuance of them till after the time of these purchases, makes out a case in favor of the plaintiffs that requires an answer from Cowdrey. He denies the facts claimed by the plaintiffs, and his testimony is in substance, that, prior to the execution of the articles, Chalker represented himself to be free from debt, and that before anything substantial had been done under the articles, and prior to the 1st of May, he discovered that these representations were untrue, and that thereupon he revoked Chalker's authority to act under the contract, and refused to act upon it as having any binding effect; and that thereafter the business was carried on by Chalker on his own account, and that he, Cowdrey, did not act as partner, but, in what he thereafter did in relation to the business, as a principal and confidential creditor, and as such interested in Chalker's concerns. If the facts are as sworn to by Mr. Cowdrey they constitute an answer to the plaintiffs' demand; for if, before the contract of the 17th of

April went into operation, Cowdrey repudiated it and refused to go on with it, and did not in fact enter into business under it, then, when the plaintiffs' account accrued, the business was not carried on upon the basis of the contract of the 17th of April, and Cowdrey is not in point of law liable as a partner.

" The question is therefore one of fact, and depends much upon the inquiry whether the testimony of Cowdrey is fully to be credited. The plaintiffs claim that he must be mistaken in saying that he repudiated the contract at the time and for the cause by him stated, because, they say, his entire conduct is inconsistent with his testimony, and especially his conduct in going to New York with Chalker as stated by him and in giving the guaranty and making the declarations to Mr. Cunningham which are proved to have been made. The case depends in a good degree upon the credit due to the testimony of the principal witnesses, Chalker on the one side and Cowdrey on the other, and the great point in issue is, whether, when the goods were furnished, the business was actually being carried on under the articles of partnership as a subsisting agreement."

The jury returned a verdict for the defendant Cowdrey, and the plaintiffs moved for a new trial for error in the charge of the court and for a verdict against evidence. In allowing the latter motion the judge did not certify that he was dissatisfied with the verdict.

*R. I. Ingersoll* and *Watrous*, in support of the motions.

1. The plaintiffs claim that at the time when the goods were sold, in August and October, 1856, Cowdrey was a partner with Chalker. 1st. The articles show that a partnership actually commenced on the 17th of April, 1855. They are not a mere contract for a future partnership. The defendants became at once joint owners of the property purchased for the partnership purposes and held it as partners. The provision that the partnership was to continue for three years from the 1st of May, 1855, does not postpone the commencement of the partnership term to that date, but merely

Reboul *v.* Chalker.

provides for the time when the partnership should terminate. 2d. The partnership having been commenced was not dissolved by the act of Cowdrey.  This act was a mere declaration that the partnership should not go on.  Chalker never agreed to a dissolution.  A single partner cannot thus dissolve a partnership, where the partnership articles provide for a specified term.  Here by the contract of the parties it was to continue for three years.  Gow on Part., 280.  Collyer on Part., § 119, note.  3 Kent's Com., 55.  Parsons' Merc. Law., 169.  Story on Part., secs. 274, 5.  *Pierpont* v. *Graham*, 4 Wash. C. C., 232.  *Peacock* v. *Peacock*, 16 Ves., 51, 55.  *Featherstonaugh* v. *Fenwick*, 17 Ves., 298.  *Crawshay* v. *Maule*, 1 Swanst., 509.  Even where the articles do not prescribe the term, the revocation must not be capricious and unreasonable.  Parsons' Merc. Law, 169, note.  The law is the same whether Cowdrey be regarded as a secret or as an ostensible partner.  But he was not a secret partner.  The omission of his name from the firm does not make him so. Story on Part., secs. 273, 4.  There is no pretense that any of the causes specified in the articles for a dissolution had occurred.  It is not claimed that Chalker had not observed the articles in every respect.  3d. Cowdrey's conduct after the attempted revocation destroys all its effect if it would otherwise have had any.  He continued for two years to have an interest in the concern, and to act as if he were a partner, and this wholly under the old agreement, as it is not pretended that any new agreement was made.  His own evidence does not show a single act on his part inconsistent with a continued partnership.  The declaration of Cowdrey that the partnership should not go on, was made at a single time, and never afterward renewed, and was made, too, as he himself testifies, at a moment of excitement, while his conduct for two years thereafter was in all respects like that of a partner, consisting of repeated examinations of the books of the concern—opening several accounts on the books— altering one charge against himself from $1,800 to $1,669, and that on the ground that by the articles he was to have goods from the store at cost—giving a letter of credit to

---

---

Chalker to buy goods in New York—and advising as to the sales of goods. His conduct would be enough, if he were a stranger, to make him chargeable as a partner; much more is it enough when an actual partnerhip had commenced and he claims to have abandoned it.

2. The verdict was against the evidence. In the view which we have thus far taken, we have looked solely at the testimony of Cowdrey himself. But the whole evidence taken together is decisive in favor of the plaintiffs. And even if the testimony of Cowdrey is to be fully credited, the inference of fact drawn by the jury as to the actual dissolution of the partnership by him, or as to his revocation of the agreement for a partnership if the articles are to be regarded as such, was wholly unauthorized and contrary to the evidence.

3. It was not necessary that the judge of the superior court, in allowing the motion, should have certified his opinion that the verdict was against the evidence. By the statute he can allow such a motion only where he is of such opinion, and where the motion is allowed it is evidence that such was his opinion. Moreover, it is not the practice in such cases for the judge to make such certificate. The present motion is in all respects in the usual form.

*Baldwin* and *Blackman*, contra.

1. The motion for a new trial for a verdict against evidence ought not to be considered by the court, because the superior court in allowing the motion has not certified its opinion that the verdict was against the evidence. Rev. Stat., tit. 1, § 155. It is the opinion of the superior court, and not of the judge personally, that is required by the statute, and the court can speak only by its record. The statute required this expression of opinion on the part of the court below, to aid this court in forming its opinion, because it is impossible for any court to judge merely from the record of the evidence whether a verdict was proper. The lower court, having the opportunity to hear the evidence, was formerly vested with the sole power of granting a new trial for such cause,

and must now exercise and certify its own judgment in the matter for the consideration of this court.

2. The verdict was not against the evidence. The court will not grant a new trial merely on the ground that the jury erred in weighing the evidence. Here was a conflict of testimony and the jury gave credit to that of Mr. Cowdrey. When the plaintiffs sold the goods to Chalker they knew nothing of Cowdrey. There was therefore no contract on his part unless the law made him a party to the contract of Chalker by force of the partnership. And this would depend wholly upon the question whether the partnership contract of April 17, 1855, was in force at that time. The defendant Cowdrey claimed to have repudiated that contract before it went into operation and to have refused to go on with the partnership, and the question of fact whether he did so was fairly presented to and decided by the jury. The court will not review the conflicting evidence upon which they came to their conclusion.

3. This leaves open only the question of law whether Cowdrey had the power to break the contract and refuse to go on with the partnership. 1st. The contract was merely executory. It provided for a future partnership, to commence on the 1st of May following. It speaks of its being the *intention* of the parties to *form a co-partnership*. The term was to be for *three years from the 1st of May*. Until the first of May there was merely an agreement for a future partnership, not a partnership itself. This agreement Cowdrey could break as well as any party to an ordinary contract can break it, and respond in damages. His right to commit this breach does not depend at all upon the right of a partner to dissolve an existing partnership. By the breach of the contract to form the partnership, the partnership never was formed and never existed. 2d. If the partnership is to be regarded as commencing on the 17th of April, 1855, yet Cowdrey had the right to dissolve it at any time during its existence. In *Skinner* v. *Dayton*, 19 Johns., 538, it is laid down that there is no such thing as an indissoluble partnership, and that either partner may declare a dissolution at will.

The same doctrine is considered and approved by Kent. (3 Com., 54.) See also Collyer on Part., sec. 119, note 1. Further, Cowdrey was only a dormant partner, and such a partner may at any time withdraw and escape liability for future debts. Story on Part., sec. 159. There is no good reason why a partnership contract may not be broken at the will of either party as well as any other contract. It is but a contract, with no higher obligation than other contracts, and the breach can be compensated by damages as well as in the case of any other contract. The personal relation into which parties are brought in a partnership, the mutual confidence and harmony necessary to the successful prosecution of the partnership business, and the power which each partner possesses to annoy and injure the other, are special reasons why a partner should always have the power to terminate the partnership, and submit to an award of just damages for doing it. It is a matter in which the public have no interest, but only the parties themselves, as in any event the rights of third persons are protected. The principle on which one partner can bind another by his contract, is that each is the agent of the other, and yet in other cases of agency the principal has the power to revoke the authority of the agent.

HINMAN, J. The defendants raise the preliminary question, in respect to the motion for a new trial on the ground that the verdict is against the evidence in the case, whether the court will consider the motion at all, for the reason that the judge of the superior court has not certified that he is of opinion that a new trial ought to be granted, or that the verdict was, in his opinion, against the evidence in the case. It is true that by the statute, (Rev. Stat., tit. 1, § 155,) the superior court is only authorized to make a statement of the evidence, and report the same to the supreme court of errors for that court to act upon in granting or refusing a new trial, when it shall be of opinion that the verdict of the jury is against the evidence given in the cause. The superior court is also to allow or grant a rule to show cause why a new trial should not be granted on this ground at its discretion, if it is of this

Reboul *v.* Chalker.

opinion.   There is no ambiguity in the statute, and we suppose, of course, that a rule to show cause why a new trial should not be granted is never allowed unless the superior court is of opinion that the verdict is against the evidence in the cause.   The practice of allowing, as a matter of course, cases to go up for review on this ground, would be attended with much vexation in increasing the amount of litigation, besides the practical difficulty which is always felt in reviewing a question of fact upon a mere statement of the evidence on paper, without an opportunity to judge of the credit due to witnesses from their appearance upon the stand. While, therefore, we think the statute very properly discriminates between motions of this sort and motions on which questions of law only are raised, making the allowance of the former discretionary, and only to be granted where the judge is of opinion that the verdict is against the evidence, while in the latter case he has no discretion, but is bound to allow them, yet we have never understood the practice to require a formal certificate of the opinion of the court in the former case, as preliminary to the bringing up of the evidence for review.   We believe the practice on this point to have been various.   We are aware that some judges have, out of abundant caution, in reference to the language of the statute, always made such a certificate in the motions allowed by them to go up on this ground ; but this has not been the uniform practice.   And until the practice becomes so uniform as that all may be supposed to be acquainted with it, or the court shall see fit to make a rule requiring it to be done, we think it might operate as a surprise upon a party to hold that the statute required it to be done.   We feel disposed therefore, in this case, to look upon the granting of the rule to show cause why a new trial should not be granted, as sufficient evidence that the judge was of opinion that the verdict is against the evidence, presuming that he would not have allowed the motion on any other ground.

With regard to the motion for a new trial on the ground that the judge mistook the law in charging the jury, or rather, that he misconstrued the instrument of the 17th of April,

1855, executed by Cowdrey and Chalker, and under which the partnership was claimed to exist:—That instrument states that it was the intention of the parties to form a co-partnership, which was to continue for the term of three years from the first day of May, 1855, and although it states that the parties were then, that is, on the 17th of April, the proprietors of stock in equal proportions, a schedule of which is referred to as contained in the stock book, and the articles provide that they shall continue to be the owners of the same in the same proportions, still, we think the judge was correct in considering the articles as providing for the co-partnership to be commenced on the 1st of May. They had, as preliminary to the commencement of their business, purchased or procured a stock of goods. But they could do this, as well as purchase books, and rent a store where the business was to be carried on, without actually entering into or commencing any partnership dealings. And when the articles speak of the partnership continuing three years from the first of May, 1855, we think it fair to infer that it was not to commence till that time, and that the stock which had been procured belonged to them as joint owners or tenants in common and not as partners. If we are right in this, that the partnership did not in fact commence until the first of May, it is quite clear that until that time it was in the power of either party to refuse to go on with it. It was like any other executory contract, which either party may refuse to carry out; and the remedy for such refusal would be an action for such damages as the party may have suffered in consequence of it. But in regard to third persons there would be no partnership, notwithstanding the articles. This, if we are correct, renders it unnecessary to examine a more difficult question raised in the case, as to whether it was competent for Cowdrey, after the commencement of the co-partnership, to dissolve it at his pleasure, and without reference to the causes for which it is provided in the articles that either party may dissolve the concern. We therefore express no opinion on that point.

The remaining question is, whether the verdict is contrary

Reboul *v.* Chalker.

to the evidence in the case. And this depends principally upon whether Mr. Cowdrey did, in point of fact, previous to the first of May, 1855, give notice to Chalker that he should refuse to go on with the partnership under the articles, and whether he did refuse to so go on, as a partner, and was not concerned or connected with him in the purchases thereafter made apparently on the partnership account. And here, in this part of the case, it must be admitted that the question must rest very much upon the testimony of Mr. Cowdrey and the witnesses in his behalf, construed in reference to such conceded or indisputable facts as appear in the case, because the jury had a right to weigh the whole evidence, and it was their duty to do so; and it is not competent for the court to say that they came to a wrong conclusion because they believed one witness or a class of witnesses on behalf of the defendant, and disbelieved the witnesses on the part of the plaintiffs. So far then as the testimony on behalf of Mr. Cowdrey relates to facts stated by his witnesses, we concede that they must be considered as proved to the satisfaction of the jury and therefore true, but so far as these witnesses speak of inferences, either of fact or of law, which they draw from facts or circumstances proved, or appearing in the case, or out of it, they are of course open to examination. It must therefore be admitted that Mr. Cowdrey is correct in stating that before the first of May, 1855, he told Mr. Chalker that the writing between them (meaning the articles of co-partnership) would not be carried out, and was of no effect; and had he acted in accordance with this notice, we cannot doubt that the partnership never would have existed. But Mr. Cowdrey states that at this time he was somewhat excited. He had learned that Chalker, with whom he had agreed to form the co-partnership, owed debts which had not been disclosed to him. He charged him with having deceived him. He thought he equivocated in respect to his debts, though he admitted that he owed one Moser and others, but said that by the aid of his friends he could satisfy them. Now it was in this conversation, and under the excitement arising from it, and from the fact which it discloses of

the indebtedness of Chalker, that Mr. Cowdrey told him the writing was of no effect and would not be carried out. These circumstances lead us to doubt whether there was, even at this time, any settled design to refuse to enter into the co-partnership. Had there been, it would seem that he would hardly have remained satisfied with this naked declaration. Surely, he would have taken some measures to obtain his share of the capital stock, without leaving it in the custody and control of the individual who had thus deceived him. Besides, he at this time told Chalker that he would shut up the store with an officer if those debts were not paid. Considering then that he appears at this time to have had it in his power to thus shut up the store, and considering the circumstances which will presently be alluded to, we infer that although he then gave notice of his intention not to go on with the business in the manner in which he mentions, yet on the agreement of Chalker to settle these debts, which were the cause of his dissatisfaction, he did not intend really to carry his intimation into effect. Again, although it is, we think, true that in a strict technical sense the partnership had not commenced under the articles, because they provide for its commencement on the first of May, still, as the parties provided themselves with a stock of goods, and with a store where the business was to be carried on, and with books of account, and, so far as we know, with all the requisites for the commencement of the business, these circumstances are to be taken into consideration in arriving at the meaning of Cowdrey when he declared to Chalker that the writing would not be carried out. Under these circumstances, mere neglect to take any measures to secure to himself his share of the property, but on the contrary suffering Chalker to dispose of it at the store just as it was contemplated in the articles that the property should be disposed of under the partnership, is a strong circumstance indicating that the language used to Chalker was either an angry expression of his excited feelings at that time, which the parties did not consider as intended to be carried out, or that, if he had any such intention at the time, he changed it

before the first of May, on the agreement of Chalker to settle his outstanding individual debts. But Mr. Cowdrey did not rest with merely doing nothing. He states that both he and Chalker immediately commenced making efforts to sell; and it appears that he was often at the store after the first of May, making entries in the books, taking an inventory, and, in various ways, acting in a manner which was very proper if he was a partner, but which we think was wholly inconsistent with the relation, which he claims at this time, of being a mere creditor of Chalker. No doubt he was dissatisfied with the fact of Chalker's indebtedness, and probably intended to get back the value of the property advanced in order to purchase the stock of goods, and perhaps he intended after accomplishing this to dissolve his connexion with him; but we think he intended to make use, and did make use of the power which the articles gave him as a partner to effect this object, rather than the power which he had as a creditor. He undoubtedly considers himself to have been a creditor of Chalker, and as the party who had advanced the greatest share of the capital stock, he, in a sense, was so. But we think he was more than a mere creditor and that it is his interest to be treated as a creditor rather than as a partner, which, after this length of time, has induced him so to consider himself. Again, his giving a letter of credit to Chalker to get goods in New York, to any amount not exceeding at any one time a thousand dollars, seems to be inconsistent with the claim that, in consequence of Chalker's having deceived him in respect to his debts, he determined to dissolve the co-partnership. This letter is dated the 11th of May, 1855, and must, therefore, have been very soon after the conversation in which he informed him he should not carry out the writing between them.

Now, when we consider that the articles of co-partnership, together with the parol testimony on the part of the plaintiffs, make out a very clear and satisfactory case against Mr. Cowdrey as a partner with Chalker, we do not think this case, thus made out, is answered by the testimony of Mr. Cowdrey that he was not a partner. We look upon this

rather as the expression of his opinion upon the facts as he views them, and upon the law as applicable to those facts, than as testimony to the fact that no partnership existed between them. And much of the testimony of Mr. Cowdrey himself, some of which has been alluded to, we consider as going rather to establish the claim made by the plaintiffs, than the claim made by himself. And we think the jury must have been misled in relying too much upon the testimony of Mr. Cowdrey as to mere matters of opinion, which led them to overlook the strong facts and circumstances proved in the case, and which ought to have led them to form a different opinion from that expressed by him.

We therefore come to the conclusion that the case should be submitted to another jury.

In this opinion the other judges concurred.

New trial granted.