EDWARD MALLEY *vs.* THE ATLANTIC FIRE AND MARINE INSURANCE COMPANY.

*M* took out a policy of fire insurance on a stock of goods in a store kept by him, the policy containing a provision that if the property was sold or transferred or any change took place in the title or possession, without the consent of the insurers, the policy should become void. *M* during the term of the policy entered into a contract with *N* by which they were to be partners in the business for three years from the date of the contract, *M* to furnish all the capital, except that *N* was within the first year to furnish $10,000, *N* to devote his whole time to the business and to receive out of the net profits twelve and half per cent. and in any event $3,000 per year, but not to draw out over $2,000 in any one year until the fund should accumulate to $10,000 above the $10,000 to be put in by *N*, and all the rest of the profits to belong to *M*. *N* was not to give or indorse notes in the name of the firm. *M* was to receive six per cent. on the value of the stock and fixtures, and rent for the store, which was owned by him, which charges were to be treated as expenses of the business in estimating the net profits. On the same day *M* opened new books in the name of *M & Co.* and the business was thereafter advertised and conducted in the name of the firm. Within the seven weeks following the making of the contract the firm added by purchase to its stock merchandise of the value of $77,000, and sold goods of the value of $59,000, at the end of which time most of the stock was destroyed by fire. *N* had not paid in any part of the $10,000 which he was to contribute during the first year. His business had been the purchasing of goods for the firm, while all the proceeds of

sales had been deposited in bank to *M's* individual credit and all checks were drawn and notes given by him individually. In a suit brought by *M* upon the policy it was held—

1. That the partnership must be considered as actually existing at the time of the fire, and as being one, not merely as to creditors of the firm, but as between the partners, constituting a community of interest in the stock of goods.

2. That such a change of title was sufficient to render the policy void.

[Two judges dissenting.]

[Argued June 14th—decided July 27th, 1883.]

ACTION upon a policy of fire insurance on a stock of merchandise; brought to the Superior Court. The following facts were found by the court.

On the 12th day of May, 1881, the defendant corporation, in consideration of twenty-five dollars paid to it by the plaintiff, issued to him a policy of insurance against fire on a stock of goods owned by him; the first clause of the policy being as follows:—

" By this policy of insurance the Atlantic Fire and Marine Insurance Co., Providence, R. I., in consideration of twenty-five dollars to them paid by the assured hereinafter named, the receipt whereof is hereby acknowledged, do insure E. Malley against loss or damage by fire to the amount of twenty-five hundred dollars, on merchandise hazardous, not hazardous and extra hazardous, his own or held by him in trust or on commission, or sold but not delivered, contained in the brick building and additions thereto occupied by him as a wholesale and retail store, situate on Chapel, Temple and Center streets, New Haven, Conn. Other insurance permitted without notice until required. Amount, $2,500; term, 1 year; rate, 1 per cent.; premium, $25."

The policy also provided that "if the interest of the assured in the property be any other than the entire, unconditional and sole ownership of the property, for the use and benefit of the assured, or if the building insured stands on leased ground, it must be so represented to the company, and so expressed in the written part of this policy, otherwise the policy shall be void." Also that "if the property

be sold or transferred, or upon the passing or entry of a decree of foreclosure, or upon a sale under a deed of trust, or if the property. insured be assigned under any bankrupt or insolvent law, or any change take place in title or possession (except in case of succession by reason of the death of the insured), whether by legal process or judicial decree, or voluntary transfer or conveyance; or if this policy shall be assigned before a loss, without the consent of the company indorsed hereon; or if the interest of the assured in the property, whether as owner, trustee, consignee, factor, agent, mortgagee, lessee, or otherwise, be not truly stated in this policy; * * then, and in every such case, this policy shall be void."

The plaintiff was then doing, and thereafter continued to do, a profitable and successful wholesale and retail business in his store on Chapel, Temple and Center streets, in the city of New Haven, and for the purposes of such business was then the owner of a large stock of merchandise therein, which he was then selling, and replacing from time to time with other merchandise in the usual course of trade.

An inventory of his affairs was taken just prior to January 12th, 1882, it being completed on that day. Annexed to one of the sheets of that inventory are three statements of the business, each of that date, and marked, in their order, "Edward Malley (General)," "Edward Malley (Personal)," and "Edward Malley & Co."

On the 12th day of January, 1882, and while the policy was still in force, the following agreement in writing was entered into by the plaintiff and one William Neely of the city of New York:—

"We, the undersigned, Edward Malley, of New Haven, and William Neely, of New York, do hereby enter into the following partnership agreement, which shall remain in force three years from the date hereof, January 12th, 1882.

"We hereby agree to become partners in the business now established and being conducted by said Edward Malley in New Haven.

"The said Malley hereby agrees to furnish the capital

necessary to run the business in its present shape, except as hereinafter elected. Also to furnish the store or stores now occupied by him in the business. The said Neely shall devote his whole time and attention to the business, and not engage in any other business during the continuance of these articles, and will not, during the same length of time, give or indorse any notes, or otherwise become surety for any person or persons whatever, without the consent of said Malley, either in his own private matters or in behalf of the firm. He also agrees to furnish within the first year $10,000 capital for the use of the firm.

" The said Neely shall be entitled out of the net profits of the business to receive twelve and a half per cent. thereof; and if the net profits exceed $50,000, shall receive fifteen per cent. thereof; in any event said Neely shall receive $3,000 per year.

" In estimating the net profits there shall be deducted as a portion of the expenses six per cent. on the actual value of the stock and fixtures; also the rent of the old store at $8,000, and the shoe store, if used, at $2,000. Said store and fixtures to be kept in repair by said Malley himself.

" Said Neely shall not, however, draw out of said concern more than the sum of $2,000 in any one year, until the fund in the concern shall accumulate to the sum of $10,000 over and above that sum put into the concern by said Neely as capital. All the remainder of the profits of said concern shall belong to said Malley."

On the same day the following entry was made on the plaintiff's journal, under that date :—

"SUNDRIES TO SUNDRIES.

"487. Miscellaneous accounts as per schedule on
        trial balance page 9, debits, $535.02;
        10, credits, $1,394.29,................    $859.27
        Merchants' Bank,... ....................   11,235.98
        Invoices payable,........................  26,136.96
        Bills payable, ..........................  18,248.12
        Mrs. M. W. Malley, ......................   1,515.17
        Edward Malley & Co.,.................... 99,364.47

Malley v. Atlantic Ins. Co.

"487. Wholesale accounts,..................... $3,886.36
Retail accounts,.. ...................... 1,810.77
Bills receivable,........................... 2,069.08
Cash,..................................... 67.39
Consignments, ........................... 366.50
Insurances,............................... 508.18
Store fixtures,............................ 12,114.94
Merchandise,..... ...................... 136,536.75

'Accounts closed on Sales Ledger K, and reopened on Ledger A of E. Malley & Co."

The statement annexed to the inventory before mentioned and marked " Edward Malley & Co." was as follows :—

"Wholesale accounts receivable,........... $3,886.36
Retail accounts receivable,.............. 1,810.77
Miscellaneous accounts receivable, ....... 535.02
Bills receivable,.......................... 2,069.08
Cash,..................................... 67.39
Unexpired insurance,.................... 508.18
Store fixtures,........................... 12,114.94
Consignments,........................... 366.50
Merchandise, per inventory,............. 136,536.75
Liabilities for merchandise,.... $11,235.98
                      26,136.96
                                         $37,372.94

Liabilities for miscellanies,............... 1,394.29
Notes payable,........................... 18,248.12
Net capital,.............................. 00,879.64

                                       $157,894.99 $157,894.99 "

The business was thereafter conducted in the name of Edward Malley & Co. to and since the time of the fire, hereafter mentioned, except that the bank account of the business, kept at the Merchants' National Bank of New Haven, remained in the name of Edward Malley, and the checks and notes paid out were signed by him. Such notes were made payable at that bank.

There was no evidence that there was any other agreement between Malley and Neely, or that the same had been changed by the parties thereto.

Since January 12th, 1882, and before the fire, goods were

bought by Edward Malley & Co., from time to time, and added to the general stock of merchandise in the business, amounting to the sum of $76,767.88. During that period, also, goods were sold from time to time out of the stock, old and new, to the amount of $58,866.52.

The business was advertised as that of Edward Malley & Co. down to and since the time of the fire.

On February 9th, 1882, one Russell, who had been book-keeper for Edward Malley prior to January 12th, 1882, and who after that date remained and continued to be book-keeper for Edward Malley & Co., wrote for them to the firm of Lee, Tweedy & Co., of New York, the following letter:—

"Gent.—The firm of E. Malley & Co. was formed January 12th, 1882; Mr. Neely, late with Sweetser, Pembroke & Co., admitted less for pecuniary reasons than to afford Mr. Malley relief from some of the cares of active business. Inventory showed for the firm live assets, excluding all doubtful or overdue accounts, $157,359.97, of which $136,536.72 was in merchandise taken *low*. Liabilities on open account, $37,372.94. Notes payable, $18,248.12, held, with the exception of a few small auction house notes, by the Merchants' National Bank of this city; in other words, nearly $3 firm assets to $1 of liabilities. Last year's cash sales, nearly $600,000; profits nearly $40,000. Aside from the liabilities above mentioned Mr. Malley owes nothing save mortgages."

The general department of the business conducted by Neely between January 12th, 1882, and the date of the fire and since, was the purchasing of merchandise in the city of New York for the wholesale and retail business in New Haven.

The fire under which the loss is claimed occurred February 28th, 1882.

Neither before the fire nor since has Neely contributed the $10,000 of capital stipulated for in the contract, nor was there any evidence that he had ever received any larger sum than $2,000 a year.

Prior to January 12th, 1882, Neely was the maker of two

notes, one of about $5,000, and the other of about $1,600, for the accommodation of Edward Malley, which had been discounted by Malley in the business.

After that date these notes were renewed from time to time, with Neely as maker, and discounted, and the proceeds used in the business down to the present time, except that the $1,600 note has been reduced to $700. There was no evidence by whom the reduction was made.

The value of the goods destroyed by the fire, with the damage to goods injured, was $139,761.86. There was other insurance upon the property at the time of the fire, of $124,500. Proofs of loss were furnished by the plaintiff, which, if upon the foregoing facts the policy was in force at the time of the fire, were proper and sufficient.

Upon these facts the case was reserved for the advice of this court.

*J. S. Beach* and *S. L. Bronson*, for the plaintiff.

The defense in this case is purely technical. The Atlantic Fire Insurance Company is one of a syndicate with aggregate risks of over one hundred thousand dollars, each having the same counsel and each making the same defense. They seek to retain the premiums and evade payment of the conceded total loss under a clause in the policy which reads as follows: "If the property be sold or transferred, or upon the passing or entry of a decree of foreclosure, or upon a sale under a deed of trust, or if the property insured be assigned under any bankrupt or insolvent law, or any change takes place in the title or possession—whether by legal process or judicial decree, or voluntary transfer or conveyance—then and in every such case this policy shall be void."

The defendants say that shortly before the fire Malley made such a contract with one of the clerks in his employ, that the clerk thereby became a partner with him, and if so, they say that such a change of ownership in the insured goods resulted that the policies became void under the

clause above quoted. The plaintiff denies both the premises and the conclusion.

· 1. First, he denies the premises. Malley and Neely on January 12th, 1882, (the fire occurred in February), signed a "partnership agreement" to "remain in force three years" from its date, under which they agreed "to become partners." By the terms of the contract Malley was "to furnish the capital necessary to run the business in its present shape," and he was to be allowed six per cent. on the actual value of the stock and fixtures as "part of the expenses." Neely was to give his whole time to the business during the entire period, and "to furnish within the first year $10,000 capital." His salary was fixed at $2,000 a year, beyond which sum he was not to be allowed "to draw, until the fund in the concern shall accumulate to the sum of $10,000, over and above that sum put into the concern by said Neely as capital." In computing this accumulation of the fund Neely was to be credited "out of the net profits of the business twelve and one half per cent. thereof; and fifteen per cent. if the net profits exceed $50,000."

We concede that the signatures of the parties to this contract created a possible partnership *in futuro*, but we deny that it created an existing partnership *in presenti*. Neely was to have an annual salary of $2,000, but he was to have no community of interest in the profits until he put in the $10,000; and even after he had put in this amount, although he then began to have an interest in the profits, he had no ownership therein, till the fund he put in had accumulated to $20,000.

*Haskins* v. *Burr*, 106 Mass., 50, shows exactly what would have been Neely's status in the business, if, and after, he had put in the $10,000. "The plaintiff," say the court, "has in one sense an interest in the profits, because their accumulation and application to the incumbrances on the property hasten one of the contingencies on which he may demand a conveyance and have the right to be a partner in the business, but he has no property in the profits."

The contingency upon which Neely was to have a com-

munity of ownership in the profits, and so "become" a partner, was the happening of a double event:—first, his contributing $10,000 to the capital, and second, the accumulation of that fund by adding thereto an agreed percentage of the profits of the business until the fund aggregated $20,000. "Persons who are only contemplating a future partnership, or who have only entered into an agreement that they will at some future time become partners, cannot be considered as partners before the arrival of the time agreed upon. It is not always easy to determine whether an agreement amounts to a contract of partnership, or only to an agreement for a future partnership. The test however is to ascertain from the terms of the agreement itself, whether any time has to elapse, or any act remains to be done, before the right to share profits accrues, for if there is, the parties will not be partners until such time has elapsed or act been performed." Lindley on Partnership, § 27. Here, not only the time agreed upon for a community of interest in the profits had not arrived, but it had not even begun to run towards its goal; for Neely, up to the time of the fire, had not contributed one dollar to the capital. He therefore was not, as between himself and Malley, a partner either in fact or in law, during the interval after the date of the contract up to the time of the fire.

He was not a partner in fact, because the record tells us that for all goods purchased during that period Malley gave his own individual check, if the goods were bought for cash; if bought on credit, Malley gave his own individual note, and when the goods were sold out of the store, the entire proceeds went at once into the exclusive custody and control of Malley. They were deposited by him in bank in his own name, and subject only to his individual check. There was not in law any partnership as between the parties to the contract during the interval between its date and the fire, because there was during that period no community of interest in the profits, actual or even contingent; for the interest which "in one sense" Neely in the future was to

have in the profits, was contingent upon the "act" of his putting in as capital $10,000, and he had at the time of the fire put in nothing.

It may be that Neely so held himself out as a partner of "E. Malley & Co." that as against creditors he would be estopped to deny his liability as a partner. But the defendants are in no position to invoke the aid of this estoppel. The law of estoppel forbids proof of a fact, not because it is untrue, but because the one who offers to prove it ought not in good conscience to be permitted to prove its truth as against his opponent whom he induced to act upon the faith that it was not true. And therefore it is that an estoppel can never work a forfeiture. But outside of this general principle, there is, as applied to these unilateral contracts, the well settled rule that "to avoid a policy of insurance on the ground that the property has been alienated, an alienation *in fact* must be shown by the insurers, and the burden of proof is upon them." Wood on Fire Ins., § 320, and cases there cited. Clearly the defendants do not lift that burden by an assumption of partnership between Malley and Neely based upon an imaginary estoppel between Neely and creditors.

2. But we insist further, that if the defendants' premises are true, if Neely was a partner at the time of the fire, there had not been any " change or transfer of title or possession" in the insured goods. *Prima facie* each partner may be presumed to have a joint and equal interest both in the property and in the profits. But to know whether the fact be so or not in any given case, we must study the contract under which they became partners. Unless indeed it be so, as claimed by the defendants, that, if partners, the law by its own vigor and force and in spite of any agreement of the parties to the contrary, allots to each partner as his individual right against the other partners, an equal interest in the profits and a like title in the property or the capital with which the business is carried on. If such be the law there is strength in the claim that a change of title resulted from

this contract, under the concession that it created a partner-
ship *in presenti.*

But such is not the law. The law indeed says that the
trading community are not bound to know the terms of the
contract of partnership, and that, as against them, such
equality of interest will be assumed, whether it in fact be
so or not. *Winship* v. *Bank of U. States*, 5 Pet., 529. But
the law also says that, as between the partners themselves,
their respective interests in the profits are limited, and their
respective ownerships of the capital are measured, by their
own contract, and not by any inference or presumption of
law. *Whitcomb* v. *Converse*, 119 Mass., 38; *Livingston* v.
*Blanchard*, 130 Mass., 341; *Hankey* v. *Becht*, 25 Minn.,
212. The same rule is found in every text book. Story
on Part., §§ 27, 54; Parsons on Part., 52; Lindley on
Part., 19, 20. As stated by Lindley, " one may be a part-
ner in a business or in the profits arising from it without
being a part owner or partner in the property with which
the business is carried on." As is said by GRAY, C. J., in
*Whitcomb* v. *Converse* (supra), " this depends upon the
nature and extent of the contract of partnership."

Let us then study this contract, to the end that we may
find out, if we can, whether by its terms Neely became
" part owner in the property with which the business was
carried on." The contract opens with a statement that
" the business " into which Neely came as a partner, was then
" established," and was " being conducted by the said
Edward Malley in New Haven." It then states that " the
said Malley hereby agrees to furnish the capital necessary
to run the business in its present shape; * * also to furnish
the store or stores now occupied by him in the business."
It further provides that as a part of " the expenses " of the
business, Malley was to be paid an agreed rent for the stores,
and an agreed rate of interest " on the actual value of the
(insured) stock and fixtures."

Our enquiry is, did Neely thereby become a part owner
of the capital used " in the business as then established and
to be run in its then present shape." Bear in mind that

this question ignores all legal *primâ facie* inferences drawn from, or presumptions based upon, the mere fact of partnership. It is a question which "depends upon the contract." With the contract spread out before us, is there or is there not to be found within its four corners a transfer of title from Malley to Neely in the insured stock and fixtures? Prior to the signing of that contract Malley, it is agreed, was the sole owner of the entire capital, consisting of the stores, the stock and the fixtures. Would the recording of this contract, sealed, witnessed and acknowledged, have transferred to Neely any title to the stores? Why not, if it transferred to him a title in the stock and fixtures? The relation between the parties as to each class of property was identical. Malley was to furnish the stores, and to be paid an agreed rent therefor as part of the expenses of the business. He was to furnish the stock and fixtures and to be paid an agreed rate of interest on their value. But if Neely became under the contract a part owner in the stores, he would hardly agree that Malley should have the whole of the rent, and so if he became part owner of the stock and fixtures, he would have the same reason to object to Malley being paid six per cent. interest on their entire value.

It must, we think, be obvious that this contract did not contemplate, and did not effectuate, any actual change of title either in the stores or in the stock and fixtures. Put it to a practical test. It appears that at the date of the fire the value of the stock and fixtures was about $140,000. Suppose there had been no loss by fire, but that Malley had died on the day it occurred. The record tells us that between the date of the contract and that of the fire the business had been profitable. The debts then being paid, a surplus remains as profit—say $8,000. Neely, under our present concession, is entitled as a partner to his pro-rata share—say one eighth—of these profits. But if he became under this contract also a part owner of the stock and fixtures, he has a valid claim against the estate of Malley for his share of their value. If he is the owner of any part of the capital,

there being but two partners, he owns one half of the stock and fixtures. It results then that his six weeks' partnership with Malley nets him, in addition to $1,000 as his share of the profits, $70,000 as his share of the value of the stock and fixtures. The mere statement of such a claim ought to prove it untenable. And yet the claim is not without a precedent, to be found in *Livingston* v. *Blanchard*, 130 Mass., 341. Livingston and Blanchard became partners under an agreement by which Livingston put in $3,000 capital. Blanchard put in no capital, but was to have a salary of $1,000 a year. The profits, after deducting, as in this case, the amount paid to Livingston for rent and for interest on the capital as a part of the expenses of the business, were to be equally divided. Livingston died. The business was closed up and showed a profit of $600. Blanchard's claim against the estate of Livingston was for $300, his half of the profits, and also for $1,500, as part owner of the capital stock with which the business had been conducted. The Supreme Court of Massachusetts allowed Blanchard's claim to one half of the profits, but it is hardly necessary to add that his claim of part ownership in the capital was by that court rejected.

We submit then, both on principle and authority, that even if a present existing partnership between Malley and Neely resulted from this contract, Neely was not at the time of the fire a part owner of the insured property, but that Malley after the contract remained as before its sole owner, and if so, of course there was no change of title and no forfeiture.

3. But even if a technical change of title had resulted from the contract, such change would not vitiate the policy. " The object of the insurance company in this clause is that the interest shall not change so that the assured shall have a greater temptation or motive to burn the property, or less interest or watchfulness in guarding or preserving it from fire. * * If the real ownership remains the same, if there is no change *in fact* of *title*, but only the evidence of it, and this latter change is merely nominal, and not of a nature to

increase the motive to burn or to diminish the motive to guard the property from loss by fire, the policy is not violated." May on Insurance, § 273. " To seize on words inserted in a policy as a safeguard, and make them available to defeat a claim of the assured on the theory of a technical forfeiture, is in no possible view permissible. If the policy admits of such a construction it is due to the dexterity of the draftsman, and not to a meeting of the minds of the parties." *West* v. *Citizens Ins. Co.*, 27 Ohio St., 13. While the books abound in cases of claimed forfeiture of the general character thus spoken of, it is now for the first time that any company is pushing its " seizures " so far as to set up in evasion of its contract obligations a claim of forfeiture such as these defendants here rely upon. The nearest approach to a precedent is *Cowan* v. *Iowa State Ins. Co.*, 40 Iowa, 551. In that case the plaintiff had sold the insured property to a firm of which he was a member, and the policy, as here, provided that it should be void " in case of any transfer or change of title in the property insured." The court say :— " The transfer pleaded was by the plaintiff to a firm of which he was a member. * * It is true that to a certain extent a co-partnership is considered a person separate from the partners, * * but it is not true that a partner by a sale of the property to the firm actually parts with the interest he holds in the firm property. That such a transfer should work a forfeiture is not demanded for the protection of the underwriters, and we have never heard of a construction giving such effect to a condition against alienation."

*F. Chamberlin* and *J. W. Alling*, for the defendants.

*First.* Was the partnership agreement between Malley and Neely such that Neely became an owner in the stock of goods destroyed by the fire? If he became such owner, then, before the fire, there had been a change of title thereto.

1. The agreement is distinctly declared by the parties to be a "*partnership agreement*, which shall remain *in force* three years from January 12th, 1882." And, as if that expression were not enough, the contract goes on to state

" we *hereby agree to become partners* in the business now established and being conducted by said Edward Malley in New Haven;" and the expressions "firm," "concern," "capital," "partners," "partnership," and "the business," occur on almost every line of the writing. So that it is absolutely certain that Malley and Neely *intended* to become *partners* with each other, and that they should.on and after January 12th, 1882, sustain *that* relation towards each other, and none other, in the business thereafter to be carried on by them.

2. Having clearly and precisely expressed the agreement to become partners and set out the business to be carried on by the partnership, the writing then goes on to define how the capital stock is to be furnished. "Malley hereby agrees to *furnish* the capital necessary to run the business in its present shape," except "that Neely, during the first year, is to put in $10,000 capital for the use of the *firm*, and allow about $1,000 per annum of profits to remain, until he shall have $20,000 in the business." Neely is to devote his whole time and attention to the business, and not engage in any other. Accordingly, in the inventory of January 12th, 1882, after the general and personal affairs of Edward Malley had been adjusted, comes the "statement of Edward Malley & Co." of that date. First are put down the resources of Edward Malley & Co. They are the wholesale, retail and miscellaneous accounts and bills receivable, cash, *unexpired insurance*, store·fixtures, consignments and merchandise. Then are put down the liabilities of Edward Malley & Co. for merchandise, miscellaneous accounts and notes payable; leaving the net capital of Edward Malley & Co., "furnished" by Edward Malley, $100,879.64. It is significant to note that the unexpired premium on the policy in suit is rightly put down as an asset of the firm. Neely, during the two months that elapsed after the partnership agreement and before the fire, put in no part of the $10,000 capital, but he did assist by his name in causing a sum of $6,600 to be raised for the benefit of the firm. Assuming that the business continued "profitable and suc-

cessful," there would be added to the concern the excess of Neely's share of the profits above what he was to draw out during that period. Neely did enter into the prosecution of the business, taking the most important and responsible branch of the whole, the buying of the goods in New York, and did devote his whole time and attention thereto. So that the capital contemplated by the writing was, up to the time of the fire, furnished by the respective parties, according to the terms thereof. It has no significance that since the fire Neely has not furnished the $10,000 capital. Of course he has not. Probably Malley regrets the existence of the writing, and Neely shares in the regret, and both desired, after the fire, to act in the manner least prejudicial to their interests.

3. The writing having provided for the capital and labor, next comes the question of profits. Neely is to have out of the *net* profits of the business, twelve and a half per cent., and if the net profits exceed $50,000 he is to have fifteen per cent., and out of the net profits at least $3,000 per year; but as part of the expenses of the business Malley is to have six per cent. on the stock and fixtures put into the concern. There is no guaranty that Neely shall receive $3,000 per year if there are no net profits. The context and the whole tenor of the agreement permit no such construction. Neely is not an agent; he is a partner. The writing does not prescribe how losses are to be borne. It was not believed by either party that the business could be run at a loss. But the general principles of law provide how a supposed loss would be adjusted. In every other contingency than making $50,000 net, Neely was entitled to one eighth of the net profits. In case of net loss he would share in it in the proportion of one eighth to seven eighths for Mr. Malley.

4. There is a single limitation of the power of Neely as a partner. He cannot sign the firm paper without the consent of Malley; but this limitation does not affect his title or interest as partner. It would not affect his power to bind the firm in transactions with parties ignorant of the limitation. *Winship* v. *Bank of U. States*, 5 Pet., 529.

5. Business was conducted publicly by Malley and Neely by the firm name under the agreement. Goods to the amount of $77,000 were bought by them and added to the stock. Goods to the amount of $56,000 were sold by them out of the general stock in trade, whether new or old. The bank account remaining in Malley's name is explained by the limitation upon Neely with reference to the signing of the firm paper, by the fact that Malley had a large private estate outside this business requiring a bank account, and by the fact that but little time elapsed after the agreement and before the fire.

6. Upon these facts the authorities amply sustain our position that the stock of merchandise at the time of the fire was owned by Malley and Neely, and was partnership property. The case of *Adams Bank* v. *Rice*, 2 Allen, 480, is, in its essential features, like the present. There Fox took his bookkeeper, Delahanty, as a partner, who neither contributed nor agreed to contribute anything towards the capital stock, telling him he should have $1,500 the first year, and the next year an interest in the business, to which Delahanty assented. The only writing signed was as follows: "Copartnership. The subscribers have this day formed a copartnership under the style of William B. Fox & Co., and will hereafter carry on the business formerly conducted by Fox & Rice." Public notice was given of this agreement, and the business was thereafter carried on under the name of William B. Fox & Co. Fox died before the expiration of the first year. Delahanty, after his death and during the first year, made an assignment of all the property of the business in insolvency. The question was whether he had the title to the property, so that the assignment was valid; and it was decided in the affirmative. BIGELOW, C. J., in giving the opinion of the court, says: "It is not a question whether a person is clothed with the character of a copartner contrary to his intent, as to third persons, by operation of law, so as to render him liable on contracts made in the course of an alleged joint dealing. It is admitted that the parties intended to form a copartner-

ship, and, in pursuance of such intention, agreed to become partners together, and that subsequently they actually carried on business as joint traders. The question therefore is, whether, owing to the peculiar nature of the stipulations by which they undertook to regulate among themselves their joint dealings, the law will imply that they sustained toward each other a different relation from that into which they intended to enter. On a careful analysis of the agreement between them, on which their association and connection in a joint business were based, we are of opinion that they also sustained toward each other the relation of copartners." In the case of *Taft* v. *Schwamb*, 80 Ill., 289, the articles provided for a copartnership, to commence November 28th, 1867, and continue thirteen months, ending December 31st, 1868. They then proceed as follows:—"And to that end and purpose the parties above-named have each delivered in as capital stock as follows:—Schwamb the building No. 490, S. Canal street, and all machinery, including engines, boiler, tools, benches, lumber, manufactured stock and in process of manufacture, estimated to be worth say $9,619.37. The other two partners to put in $2,500, and allow interest on the excess over $2,500 furnished by Schwamb. It is further agreed that if, at the expiration of said copartnership, said Taft & Crego shall wish to continue said copartnership, and become equal owners in the capital stock, they can do so upon a renewal of said copartnership." On the first of January, 1879, the partnership agreement was extended and the interests of the partners declared thereafter to be equal. The building was burned August 9th, 1879. The question was, whether the loss was to be borne by Schwamb or by the partnership; and it was held to be the loss of the partnership, to be shared by all the partners. The court, by SCOFIELD, J., say: "It would, in our opinion, be difficult to employ language more clearly indicating that the 'building, tools,' &c., became the property of the copartnership and ceased to be the individual property of Schwamb, than that employed in the articles. It was delivered in as capital stock. What is 'capital stock,'

in the sense in which the words are here used? Unmistakably, the capital or property of the partnership." So in *Bopp* v. *Fox*, 63 Ill., 543, the same court says:—"It is undoubtedly true that the partners may, by contract, stipulate that the ownership of property may remain in one, while the partnership shall only have the use of the property, or make any other regulation as between themselves they may choose, in regard to the ownership of property used in connection with the business of the copartnership, not prohibited by law; but the present case is unaffected by any such stipulation." Where two persons enter into articles, by which they agree to associate themselves as copartners, in a designated business, one of them to contribute the capital and the other skill and labor, and the profits to be divided in unequal proportions, a definite salary being guaranteed to the one who contributes his time, labor and skill, they become partners in the property and business of the firm in the proportion fixed by the articles and subject to the restoration to the other partner of the capital advanced. The interest of the partner who contributes only time, labor and skill in the partnership property may be levied on and sold by execution against him as an individual. *Knight* v. *Ogden*, 2 Tenn. Ch., 473; *Whitcomb* v. *Converse*, 119 Mass., 38; *Livingston* v. *Blanchard*, 130 id., 341; *Bradbury* v. *Smith*, 21 Maine, 117; *Hankey* v. *Becht*, 25 Minn., 212; *Savery* v. *Thurston*, 4 Bradwell, 55; *Miller* v. *Price*, 20 Wis., 117; *Tyler* v. *Scott*, 45 Verm., 261; *Reid* v. *Hollinshead*, 4 Barn. & C., 867; *Ex parte Chuck*, 8 Bing., 469; *Ex parte Owen*, 4 De G. & Smith, 351; *Rowland* v. *Crankshaw*, L. R., 1 Cha. App., 421; *Syers* v. *Syers*, L. R., 1 App. Cas., 174. It is neither necessary that community of loss should be expressly provided for in partnership articles, nor that there should be community of loss in fact, in order to create a partnership property to be owned by the partners as such. *Bucknam* v. *Barnum*, 15 Conn., 67; *Munro* v. *Whitman*, 8 Hun, 553; *Hendrick* v. *Gunn*, 35 Geo., 234; *Ex parte Langdale*, 18 Ves., 301; *Gilpin* v. *Enderbey*, 5 B. & Ald., 954; Parsons on Part. (3d ed.), 43–59. In the case at bar Neely, as

well as Malley, had the partner's lien on all the partnership effects for the protection of his interest. Both were interested in the "profits as profits," in the "net profits," and in the "net profits as principal traders." *Pratt* v. *Langdon*, 12 Allen, 544. "If a partnership is entered into, a failure of one of the partners to comply with the terms and conditions of the agreement will not annul the partnership unless they are conditions precedent." *Murray* v. *Johnson*, 1 Head, 353; *Goddard* v. *Pratt*, 16 Pick., 426.

*Second.* The change of the insured property, from the ownership of Malley into the ownership of Malley and Neely, avoided the policy, under the clause prohibiting any change of title or possession.

1. The language of the condition is,—"If the property be sold or transferred, or upon the passing or entry of a decree of foreclosure, or upon a sale under a deed of trust, or if the property insured be assigned under any bankrupt or insolvent law, or *any change take place in title or possession* (except in case of succession by reason of the death of insured), whether by legal process or judicial decree or voluntary transfer or conveyance." This language is too clear and explicit to allow any question of construction to be raised. Ownership and possession by Malley and Neely, as partners, is a different ownership and possession from that of Malley alone. Another clause in the policy reads as follows:—"If the interest of the assured in the property be any other than the *entire, unconditional, and sole ownership of the property, for the use and benefit of the assured,* it must be so represented to the company and so expressed in the written part of the policy, *otherwise the policy shall be void.*" This clearly leads to the same result. Property owned by Malley, solely and entirely, was insured; and any change in such ownership, it is declared, shall render the policy void.

2. It is sought, however, by the plaintiff to bring this case within the range of those decisions where it has been held, under dissimilar clauses, that a transfer by one of two or more joint owners, jointly insured, to another owner,

VOL. LI.—16.

does not vitiate the policy. It will be found, however, that all of these cases are based upon the theory that by such transfer no stranger to the insurance is brought into the relation of proprietary ownership to the property; that, as the insurance company had been satisfied to insure all the joint owners, a transfer among these owners would not be presumed to be forbidden, unless explicit language was used, showing that this very thing was prohibited, but that the clause in question would be satisfied by applying it to cases like the present, where there is a new proprietary owner of the insured property. But it has not been decided in this state that a transfer by one partner to another of his interest in insured property *does not* vitiate the insurance where the policy contains a condition that *any change* in title or possession of the property insured without consent of the insurer should make it void. *Lockwood* v. *Middlesex Mut. Ins. Co.*, 47 Conn., 564, is simply a case where under the charter of a company which provided that " when any house or dwelling insured under the provisions of this act *shall be alienated by sale or otherwise* the policy shall thereupon be *ipso facto* void," (quite different from the clause in question), one tenant in common of real estate transferred his interest to the cotenant, and it was held that the policy was not avoided. In the case of *Hoffman* v. *Ætna Ins. Co.*, 32 N. York, 405, (a case justly considered to be high authority by reason of its being the decision of the court of last resort upon a question respecting which contrary decisions had been made before, and by reason of the eminent ability of the judge giving the opinion,) the policy contained a condition making it null and void " if the property should be sold or conveyed." A retiring partner sold his interest to his copartners, and the court held that the policy was not avoided. But there is a wide distinction between these cases and the one arising here. In the first place, the language of these conditions—(" when any dwelling insured under the provisions of this act shall be *alienated by sale or otherwise*," and " if the property should be *sold or conveyed*,") could fairly be construed to mean a sale of the entire property, while the

language used here (" if *any change* take place in the title,") is sufficiently comprehensive to include every alteration in the title, either to the whole or to a part, or to any interest in the whole or a part of the property insured. In the second place, the reasons for holding that a policy issued to a partnership or to joint tenants is not avoided by a sale by one partner or joint tenant of his interest to the others, support an opposite conclusion when applied to a case like this. In the *Lockwood* case the court say :—"Any transfer of interest between the parties insured by the policy is not an alienation within the meaning of the charter. By such a transfer no new party, with whom the defendants did not contract, is introduced, but simply the interest of those who did contract is changed. Such a change does not affect the risk, whether partial or extending to the entire interest, so long as no new party is brought into contract relations with the insurers." In the *Hoffman* case the court say :—" The design of the provision was not to interdict all sales, but only sales of proprietary interests by parties insured to parties not insured. It was to protect the company from a continuing obligation, if the title and beneficial interest should pass to others whom they might not be equally willing to trust." Wood on Fire Ins., § 334; *Pierce* v. *Nashua Fire Ins. Co.*, 50 N. Hamp., 299 ; *West* v. *Citizens' Ins. Co.*, 27 Ohio St., 11 ; *Dix* v. *Mercantile Ins Co.*, 22 Ill., 272 ; *Hartford Fire Ins. Co.* v. *Ross*, 23 Ind., 179 ; *Finley* v. *Lycoming County Ins. Co.*, 30 Penn. St., 311 ; *Western Mass. Ins. Co.* v. *Riker*, 10 Mich., 279 ; *Barnes* v. *Union Mut. Fire Ins. Co.*, 51 Maine, 110 ; *Day* v. *Poughkeepsie Mut. Ins. Co.*, 23 Barb., 623 ; *Wood* v. *Rutland Ins. Co.*, 31 Verm., 552 ; *Keeler* v. *Niagara Ins. Co.*, 16 Wis., 523, 536 ; *Home Mut. Ins. Co.* v. *Hauslein*, 60 Ill., 521 ; *Lappin* v. *Charter Oak Ins. Co.*, 58 Barb., 325, 345 ; *Card* v. *Phœnix Ins. Co.*, 4 Misso. App., 424 ; *Dreher* v. *Ætna Ins. Co.*, 18 Misso., 128.

3. Insurance companies have the same rights that other corporations and individuals have to enter into such contracts as they may agree upon with the insured, and to have courts pronounce upon the meaning of such contracts,

244 NEW HAVEN COUNTY.

according to the same principles of construction that govern in other cases. "The insurers and insured may agree upon the terms of the contract and make its validity or continuance depend upon any terms and conditions, lawful in themselves, which they may deem reasonable or proper, and whether reasonable or unreasonable is for *them, not for the courts*, to determine. The insurers certainly had the right to treat *any change or alteration* of either title or possession as material, and provide that such alteration or change should avoid the policy; and if the assured assented to the contract with this condition and limitation, effect must be given to the condition according to its terms." *Savage* v. *Howard Ins. Co.*, 52 N. York, 502; *Pindar* v. *Resolute Fire Ins. Co.*, 47 id., 114.

PARDEE, J. This is an action upon a policy of insurance against loss by fire. On the 12th day of May, 1881, the defendant executed and delivered to the plaintiff a policy of insurance against loss by fire, upon his stock of merchandise, for the sum of $2,500, to continue in force one year from that date. It provided that "if the interest of the assured in the property be any other than the entire, unconditional, sole ownership of the property, for the use and benefit of the assured, * * it must be so represented to the company and so expressed in the written part of this policy; otherwise the policy shall be void." Also, "if the property be sold or transferred * * or any change take place in title or possession, * * whether by legal process or judicial decree, or voluntary transfer or conveyance, * * then, and in every such case, this policy shall be void."

On January 12th, 1882, the plaintiff completed an inventory. Annexed to it were three statements, under the following heads:—"Edward Malley, general," "Edward Malley, personal," and "Edward Malley & Co." On that day he and William Neely signed the following contract:

"We, the undersigned, Edward Malley, of New Haven, and William Neely, of New York, do hereby enter into the

following partnership agreement, which shall remain in force three years from the date hereof, January 12th, 1882:

"We hereby agree to become partners in the business now established and being conducted by said Edward Malley in New Haven.

"The said Malley hereby agrees to furnish the capital necessary to run the business in its present shape, except as hereinafter elected. Also to furnish the store or stores now occupied by him in the business. The said Neely shall devote his whole time and attention to the business, and not engage in any other business during the continuance of these articles, and will not, during the same length of time, give or indorse any notes, or otherwise become surety for any person or persons whatever, without the consent of said Malley, either in his own private matters or in behalf of the firm. He also agrees to furnish, within the first year, $10,000 capital for the use of the firm.

"The said Neely shall be entitled, out of the net profits of the business, to receive twelve and a half per cent. thereof; and if the net profits exceed $50,000, shall receive fifteen per cent. thereof; in any event said Neely shall receive $3,000 per year. In estimating the net profits there shall be deducted, as a portion of the expenses, six per cent. on the actual value of the stock and fixtures; also the rent of the old store at $8,000, and the shoe store, if used, at $2,000; said store and fixtures to be kept in repair by said Malley himself.

"Said Neely shall not, however, draw out of said concern more than the sum of $2,000 in any one year, until the fund in the concern shall accumulate to the sum of $10,000 over and above that sum put into the concern by said Neely as capital. All the remainder of the profits of the said concern shall belong to said Malley."

On the same day the plaintiff made the following memorandum upon his journal: "Accounts closed on Sales Ledger K and re-opened on Ledger A of E. Malley & Co." Since the date of the contract the business has been advertised and conducted in the name of Edward Malley & Co.,

except that the bank account kept at the Merchants' National Bank of New Haven, remained in the name of Edward Malley, and he signed the notes and checks.

Between January 12th and February 28th, 1882, the firm added by purchase to its stock, merchandise of the value of nearly $77,000, and sold therefrom merchandise of the value of nearly $59,000. On February 28th, 1882, the stock was nearly destroyed by fire.

William Neely has not contributed to the capital the $10,000 specified in the contract, nor is there any evidence that he had received therefrom any larger sum than at the rate of $2,000 per year.

The defendant refusing to pay any portion of the loss, this suit was instituted, and the case is reserved for the advice of this court as to the judgment to be rendered therein.

The plaintiff and William Neely signed a contract which in terms declared that they thereby entered into a partnership agreement which should remain in force three years from its date, and that they thereby agreed to become partners in the business established and theretofore conducted by the plaintiff in New Haven. They jointly determine that the plaintiff shall contribute the property and Neely the labor and skill constituting the capital of the partnership. They agree upon the method of management of the "business," and upon the rule of division of the "profits of the concern" as profits. The agreement is not for a single adventure, but for the creation of the ordinary mercantile partnership. The books of account of the plaintiff as a sole trader are closed; others are opened, merchandise is bought and sold, the business is advertised and conducted in the name of the partnership. The contract creates a partnership in the fullest legal sense of that term, with all resulting rights to and duties upon each individual entering therein. With the exception of the agreement of Neely not to give or endorse notes in the name of the firm, there is nothing either in the contract or in the acts of the parties after its execution, which restrains or even manifests an

intent to restrain from its utmost reach, the opening agreement to "become partners in the business." Therefore upon the execution thereof the title to the property contributed to the capital of the partnership by the plaintiff instantly vested in himself and Neely jointly. They became joint owners or joint tenants thereof and of all additions thereto, and joint debtors therefor in proportion to their several interests. Each had an interest in every parcel and in the whole; in each was the right to joint possession and care, and the right of disposition for the uses of the firm; and the name of each became necessary to any suit for the recovery of the price.

A contract which creates a partnership in the most complete sense of that term, which invests each partner with a partnership title to the property contributed to the capital, which gives him the right to receive profits, and compels him to bear losses, in cases where each contributes an equal portion of that property, will have the same force and effect in cases where one contributes the property and the other only skill and labor; inequality in this respect does not control the interpretation of the contract; the ownership is the same in character, differing possibly in degree by agreement. In Story on Partnership, sec. 27, it is said in effect, of cases in which one partner only contributes property to the capital of a partnership, and there is no positive agreement that it shall remain his exclusive property, and no implication from the circumstances of the particular case leading to a different conclusion, that there will be presumed to be a community of interest in the property as well as in the profit and loss. In *Whitcomb* v. *Converse*, 119 Mass., 38, four persons signed articles of partnership, two contributing property and two time and skill only to the capital, profits to be divided equally after paying interest upon the property; the partnership was dissolved by consent, and one of those contributing property closed the business, which ended in a loss. Upon his bill in equity against the others, the court held that the capital constituted a debt of the partnership, to the payment of

which the partners must contribute equally; and that one
being insolvent, the other three must bear the loss equally.
The court says: "When, as is usual in an ordinary mercan-
tile partnership, a partnership is created, not merely in
profits and losses, but in the property itself, the property is
transferred from the original owners to the partnership, and
becomes the joint property of the latter. * * * Those part-
ners who contributed the capital did not contribute merely
the use thereof, but the capital itself, and were by express
agreement to receive interest at rates specified in the articles
of copartnership. The partners were by agreement to receive
each one fourth of the net profits, and by implication of law
must share in the loss in the same proportion. The capital
contributed became the property of the partnership, and the
partnership, consisting of all the partners, became liable to
Whitcomb and Converse respectively for the amount of the
capital paid in by them." The proposition that this was not
a case of contribution of the use of capital merely, but that
the capital became the property of the partnership, rests
upon the fact that certain persons signed "articles of copart-
nership * * * for the transaction of a commission business,"
by which two agreed to contribute property and two skill
only; the profits to be divided by a fixed rule after paying
interest. There was no declaration as to losses; none as to
ownership of the property; the law took care of these two
important matters.

In *Livingston* v. *Blanchard*, 130 Mass., 341, two signed
articles of partnership, one contributing property, the other
only skill and time to the capital; profits, after paying
interest, to be divided equally. The court says: "The
capital became, therefore, partnership property." This pro-
position rested, as in the former case, upon the agreement to
be partners without mention of losses or of ownership of
property.

Neely agreed to contribute $10,000 to the capital within
one year after the execution of the partnership contract. It
was quite within the power of the plaintiff, by special pro-
vision to that effect, to have postponed to any day the acqui-

sition by Neely of ownership in the property; to have made it dependent either upon this contribution, or upon the accumulation of a like sum to his credit from profits, or upon both, and to have detained him in the position of agent or clerk. But the plaintiff did not do this. On the contrary, he explicitly agreed that a partnership should have an existence of three full years, computing from the date of the contract.

He protected Neely's position as a partner during the first year from any possible effect from his failure to make the contribution by confining that effect to time subsequent. Of course the parties looked for profits, and their contract provides for the division. They did not suppose that loss would result, therefore they made no provision for that contingency; that was left to the law. The rule of division is a graduated one, depending upon the amount earned, providing in behalf of Neely that his share should not be less than a named sum. But the fact that the proportion must of necessity remain unknown until the termination of the business does not, as a matter of law, postpone the existence of the partnership from the date of the contract; and the plaintiff expressly agreed that the rule of division should go into operation upon that day.

Presumably the stock of dry goods contributed by the plaintiff, constituting the entire property of the partnership upon the day of its inception, was sold to it at the fair market value. Of course the partnership was instantly his debtor to the whole extent of its assets. Neely was joint owner with the plaintiff of these, but the ownership was burdened by the indebtedness. He had the right to be in possession, and to dispose of them; to have the proceeds applied upon partnership debts, and to share in any surplus; a right not on the day of the contract of any value in the market. Therefore, if upon that day an individual creditor of Neely's had undertaken to enforce payment of his debt from this property, he would have taken nothing by his act; probably there would have been no surplus for him. If upon the same day Neely had died, it would have availed

his representative little to have inventoried his legal right; it existed, but probably had small value in the market. If, however, within ten days thereafter, there had been an enhancement of commercial values to the extent of fifty per cent., and Neely had died, upon the consequent winding up of the business and realization of this profit his representative would have been entitled to share therein according to the rule of the contract, although Neely had made no contribution of property to the capital.

Irrevocable legal title was placed in him by the plaintiff at the moment of signing the contract; a title not depending, in any degree, upon the question whether Neely's individual creditor could or could not then gain access to it; nor upon its value in the market on that day. As, however, profits had been earned between the day of the contract and the day of the fire, Neely's legal right, acquired upon the first, had upon the last day become a valuable property. This ownership is not the less absolute because he consented to a restriction of his right to sign notes in the name of the firm; the effect of that restriction is limited to the exact expression of it. The plaintiff concedes that if Neely had contributed $10,000 to the capital, and had allowed $10,000 from his share of the profits to remain as capital, thereafter his ownership would have been as perfect in kind as that of the plaintiff; and it was possible that Neely should have paid in $10,000 within the first year, and that within the second profits to the amount of $10,000 should have accumulated to his credit; but all this would not have removed the restriction; that, by the terms of the contract, is to continue to the end of three years, regardless of all else; therefore, neither by it nor by the intent of the plaintiff is this restriction to have any bearing upon the matter of ownership.

When, therefore, the plaintiff, after the delivery of the policy, executed the recited agreement, and by it formed a partnership between himself and Neely for the prosecution of the dry goods business, and transferred the merchandise insured as his sole property to the partnership as his contribution to its capital, he invested Neely with a partner's title

Malley v. Atlantic Ins. Co.

to it which was as absolute in character as his own, although less in value; he did precisely that which he had agreed should make void the contract of insurance. For the defendant had made the continuance of the life of that contract dependent upon this, namely, that the entire burden of ownership, of caring for the property as owner, should be and remain upon the plaintiff; had forbidden him, upon penalty of forfeiture of his right to indemnity, to share this ownership, this duty, with a stranger to the contract; had refused to insure this property cared for as owner by a stranger; had refused to owe any duty to a stranger; to come under any obligation to treat with, or indemnify him in case of loss. Wood on Fire Insurance, § 334. It is true that the case of *Cowan* v. *Iowa State Insurance Co.*, 40 Iowa, 551, determines that the sale of property by the insured to a firm of which he is a member is not such a change of title as works a forfeiture; but we believe this decision is contrary to the weight of reason and precedent.

The Superior Court is advised to render judgment for the defendant.

In this opinion PARK, C. J., and LOOMIS, J., concurred.

GRANGER, J. (dissenting). Passing the overwhelming equities of the case in favor of the plaintiff apparent to every one who reads the record, I proceed to consider the cold naked question of law involved, and from the decision of which by the majority of the court I feel compelled to dissent.

If any partnership relation existed between Malley and Neely at the time of the happening of the loss in controversy, it was because the law infers such relation from the instrument recited in the opinion of the court, dated January 12th, 1882. Outside the physical act of signing that instrument, there is disclosed upon the record no act done by Neely tending to indicate that he was or claimed to be a partner in the business.

It does not appear in what capacity, if any, he had been

previously employed by Malley, but it does appear that, after the contract and up to the date of the fire, "the business conducted by said Neely was the purchase of merchandise in New York city for the wholesale and retail business in New Haven." This is all the record discloses on that subject. It excludes therefore any actual joint possession or control by Neely as joint owner of the merchandise situated and insured in New Haven; and as to the proceeds of the sale of that merchandise, it was found by the Superior Court that they were deposited in bank to the individual credit of Malley; that Neely had no control over them, but that all checks were issued and notes given by Malley individually. No check or obligation of any kind purporting to be a partnership check or obligation was ever signed by Neely. Two questions then arise: first, was there an existing partnership as between Malley and Neely at the date of the fire; and second, if there was, did that partnership involve such a change of title in the insured merchandise owned by Malley at the date of the insurance as to work a forfeiture of his claim to indemnity under the terms of this policy of insurance.

I entertain grave doubts whether even a technical partnership was created between the parties under this contract. There is a marked distinction between actual and contemplated partnership. If an agreement merely looks to a future partnership, the contractors cannot be considered partners until the event which was to make them partners happens. Lindley on Partnership, 27; *Harker* v. *Burr*, 106 Mass., 48; *Roberts* v. *Chalker*, 27 Conn., 114. That event in this case was to be the contribution by Neely of $10,000 to the capital. Until then he had no right to share in the profits as such, nor could he draw out of the concern more than the sum of $2,000 in any one year, until he had not only put in the $10,000, but until the accumulation of that fund had amounted to $10,000 in addition thereto. Neely never contributed any part of the $10,000. He was not therefore a partner as between himself and Malley at the date of the loss. It is quite true that, having permitted

himself to be held out as one of the firm by advertisement and otherwise, he would be estopped to deny a partnership liability as against creditors. But the law works such an estoppel out of considerations having no relevancy to the enquiry whether, as between the contracting parties, the title of Malley in the capital contributed by him was transferred to Neely.

. But assuming that there was a partnership created by this agreement, existing at the date of the fire, we reach the more important, because wider question, whether that agreement annulled this policy of insurance. It is said in the majority opinion that "upon the execution thereof the title to the property contributed to the capital of the partnership by the plaintiff instantly vested in himself and Neely jointly; they became joint owners thereof and joint debtors therefor." If this be so, it is not because such was the intent of the parties to the agreement, because by its terms the instrument excluded Neely from any such joint ownership of the capital, and so far from Neely intending to become a joint debtor to Malley, for property purchased by him from Malley, to be thereafter owned by himself or in common with Malley, he stipulated that Malley should as its exclusive owner be entitled to receive interest upon its whole value at the rate of six per cent. per annum. But it is said that, irrespective of the actual intent of the parties as to Malley's continued ownership, the contract creates a partnership in the fullest legal sense of that term, with all the resulting rights to and duties upon each individual entering therein, and therefore upon the execution thereof there devolved upon Neely, as a conclusion of law, such a title to the capital contributed by Malley as to extinguish his right to indemnity for the loss he has sustained by the fire. I am compelled to dissent from this proposition. I understand the law to be that "to avoid a policy of insurance on the ground that the property has been alienated, an *alienation in fact* must be shown by the insurers, and that the burden of proof is in all such cases upon them." Wood on Fire Insurance, § 320. This principle was applied, and the plain-

tiff's right of recovery against such a defense as is here interposed, was sustained, in *Orrell* v. *Hampden Fire Ins. Co.*, 13 Gray, 431, where the insured, to avoid an attachment, had represented that the insured merchandise had been sold and did not belong to her; in *Gilbert* v. *N. Amer. Fire Ins. Co.*, 23 Wend., 43, where a deed from the insured had been executed, delivered and recorded, but he was permitted to show that the delivery had been intended as an escrow, and that it had been recorded by mistake; in numerous cases cited by Wood on Fire Insurance, § 323, of executory contracts of sale, on which partial payments had been made; in *Lockwood* v. *Middlesex Mut. Ins. Co.*, 47 Conn., 553, where during the period covered by the risk, one of the insured sold his interest in the property insured to his co-tenant; in *Cowan* v. *Iowa State Ins. Co.*, 40 Iowa, 55, where there was a sale of the insured merchandise to a firm of which the insured was a member. Unless, therefore, an actual substantial change of title as distinguished from a mere technical change, results as a necessary legal inference from the creation of a partnership between the then owner of the property and his incoming co-partner, it would seem that there was not under the terms of this policy such a forfeiture as to extinguish the plaintiff's right to indemnity.

The next inquiry is therefore, having for our premises an admitted partnership, does it follow as a necessary, inevitable conclusion of law, that there is an actual community of ownership and of title among all the partners, in all the capital employed in the conducting of its business? There are two phases of this inquiry. One relates to the right of creditors to resort to a common fund, without regard to any private agreements between the partners as to its ownership. The trading community are not bound to know or to inquire into the terms of the contract of partnership as between the individual members of a firm. They may treat the capital as a trust fund for the payment of their debts and absorb the whole of it for that purpose, if necessary, even though its entirety be the contribution of a single partner. But upon the other phasé of the enquiry a very

different question presents itself. As between the partners themselves, as individuals, we must look beyond the mere fact of partnership in searching for their title to the partnership capital. If, for instance, Neely had loaned Malley $10,000, under such an agreement as to taking profits in lieu of interest, that under the ruling of this court in *Parker* v. *Canfield*, 37 Conn., 266, he thereby became a partner as between himself and the creditors of Malley, it would hardly be claimed that any such change of title resulted as would defeat Malley's claim to a recovery. We cannot, therefore, upon the mere abstract fact of the existence of a legal partnership assume, as a conclusion of law, that each partner is in fact, as between himself and his co-partners, a joint owner of the property invested in the business. Nor can we, if a conceded joint ownership exists, assume, in ignorance of their actual contract relations, in what proportion it exists, and cannot, therefore, if there be a loss, apportion that loss. All this depends upon the terms of the contract of partnership. As was said by GRAY, C. J., in *Whitcomb* v. *Converse*, 113 Mass., 36, "whether a loss of capital is a partnership loss to be borne by all the parties, depends upon the nature and extent of the contract of partnership." Another case cited in the opinion of the court, *Livingston* v. *Blanchard*, 130 Mass., 341, affords an apt illustration of this principle and of its application, because the articles of partnership between Livingston and Blanchard contained the same provisions as to the contribution of the entire cash capital by Livingston, and of his right to be paid rent and interest prior to any claim of Blanchard to share in the profits, as are contained in these articles of agreement, in which Malley represents the rights of Livingston and Neely those of Blanchard. The partnership in that case was dissolved by the death of Livingston. Upon a bill for an accounting brought by the executrix of Livingston, Blanchard claimed that upon the execution of the articles of co-partnership the title of the property contributed to the capital by Livingston became vested in Livingston and himself jointly, that they became thereupon joint owners thereof,

and that upon the settlement of the partnership accounts he was entitled not only to one half the profits, but also to one half the capital Livingston had contributed. But the court say:—"It appears from the articles of partnership that Livingston contributed the whole capital which was invested in the business, and that the profits, after providing for the expenses, including the rent of store, interest on capital and salary to the defendant, were to be divided equally between the parties. The capital became therefore partnership property, the expense of insuring which was part of the expenses of the business; and on the dissolution of the firm Livingston, or the plaintiff as executrix of his will, was entitled to repayment of the capital contributed by him before the defendant was entitled to receive anything out of the profits. The amount of the profits was ascertainable only by deducting from the assets left after paying the expenses of the business, the amount of capital invested." The opinion of the court quotes in its support from the language of the opinion in that case, "the capital became therefore partnership property." Doubtless it became partnership property as to creditors, and became also partnership property to the extent that premiums paid for the insurance were "part of the expenses of the business," but, upon the issue we are now considering, the court held that, as between Livingston and Blanchard, the capital contributed by Livingston was not partnership property, but that Livingston was the exclusive owner and that Blanchard had no title to it. This conforms to the rule laid down in the text-books; "one may be a partner in the business or in the profits arising from it, without being a part owner in the capital with which the business is carried on." Story on Partnership, § 27; Lindley on Partnership, 16; Parsons on Partnership, 52. While therefore it is true, as said in effect by Story in the section referred to, that in the absence of any agreement to the contrary (and as against creditors in spite of such agreement,) a community of interest in the capital, as well as in the profits, will be presumed, yet it is no less true that, between the parties to a partnership contract, such

presumption may be rebutted by the articles of agreement, and, oyer of them being had, it may appear, as it does here, not only that there was not to be an equal division of profits between Malley and Neely, but that Malley was to remain the owner of, and as such to receive interest upon, the capital he contributed. Again, joint ownership in the partnership property, where one contributes no capital, is a mere inference or presumption of law. The law infers such community of ownership between the partners, because, where one shares in the profits, it is just that he should bear his proportion of the loss, and the only way he can fairly be held to contribute to a loss of capital is by imputing to him a legal ownership therein. But this inference of the law may be overcome by the language of the partnership agreement; and in the present case the agreement provides that "in any event said Neely shall receive $3,000 per year." This amounts to an indemnity against loss, and destroys the foundation of the legal presumption of joint ownership, for a participation in the profits alone, accompanied by an indemnity against loss, is inconsistent with ownership of the capital itself. Nor do I understand this legal inference to go to the extent of imputing such ownership generally and for all purposes to a non-contributing partner, but only in a restricted sense and for special purposes. Thus, in the Massachusetts cases cited, it is said that the capital contributed became partnership property, but nevertheless in both cases, upon dissolution of the partnership, the ownership of the non-contributors evaporated, and the title of each contributing partner to the amount originally furnished by him remained unimpaired. In one of these cases there was a loss, in the other a profit; and it was held that before the partnership loss or profit could be divided, the sum put in by each contributing partner must be repaid. Whatever may have been the fictitious title of the non-contributing partner to the capital during the continuance of the partnership, when tested by a division of the capital itself his substantial title was nothing at all. The utmost that can be said is that for certain purposes and awaiting certain

contingencies which may or may not arise, the law assumes a latent ownership of the capital in all the partners. Creditors are permitted to share in this assumption, though they be, as in one of the Massachusetts cases, partners themselves. It exists for their benefit, and is held in abeyance to await a proper occasion for its beneficial operation. But until a contingency occurs where the assumption is invoked for just cause, as in favor of creditors, the ownership which is not founded in actual contribution of capital, but has only an embryo existence in the policy of the law, is an unsubstantial and dormant thing. One who is not in fact a partner, may, by so holding himself out, become a partner in the eye of the law. So one who is not in fact a part owner of capital may, by the mere act of signing a partnership agreement, become in the eye of the law a part owner. But the first is not thereby entitled to the profits of a real partner, and neither is the second a real part owner. Each has put himself in such position that the law, in pursuance of the general policy, may, if certain contingencies arise, and for the benefit of those having higher equities, declare that to be true in law which is not true in fact. But no such contingency has arisen in this case. This policy of the law which protects creditors is not here invoked to aid them in enforcing their rights; but it is invoked to enable the defendant to so construe this contract of indemnity as to escape liability for a just and (but for such construction) legal claim.

In further support of the foregoing views I refer to the case of *Lycoming Insurance Co.* v. *Barringer*, 73 Ill., 230.

I am of the opinion that there was not such a change of title in the insured property from Malley to Neely as avoided this policy, and that the Superior Court should be advised to render judgment for the plaintiff.

In this opinion CARPENTER, J., concurred.